UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

VICKI J. SWANSON
o/b/o J.M.C.S., a minor child,

                                        Plaintiff,

            v.                                                    5:06-CV-97
                                                                 (FJS/GJD)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

CHRISTOPHER CADIN, ESQ., for Plaintiff
WILLIAM H. PEASE, Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the

Honorable Frederick J. Scullin, Jr. Senior United States District Judge, pursuant to

28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance

with General Order 18.

## PROCEDURAL HISTORY

Plaintiff[1] filed an application for Supplemental Security Income (SSI) benefits

on January 31, 2003, when he was six years old.  (Administrative Transcript (T.) 46-

48).  The application alleged a learning disability plus a speech and language delay.

(T. 32, 28, 53).  The application was denied initially on April 30, 2003.  (T. 29).

Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and a

_____

[1]The child plaintiff, J.M.C.S., will be referred to as the plaintiff.

hearing was held on April 29, 2004. (T. 168-217).  At the hearing, plaintiff[2] and his

mother testified. *Id*.  In a decision dated May 26, 2004, the ALJ found that plaintiff

was not eligible for SSI payments. (T. 8-21).  The ALJ's decision became the final

decision of the Commissioner when the Appeals Council denied plaintiff's request

for review on November 25, 2005. (T. 44-47).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The plaintiff meets or equals the listings 112.05(D) and/or 112.05(F).

(Plaintiff's Brief at 12-18)(Dkt. No. 9).

(2)  This case should be remanded for appropriate development of the record.

(Plaintiff's Brief at 18-20).

(3) Plaintiff's impairments functionally equal the listings, with marked

limitations in the domains of acquiring and using and attending and completing

tasks. (Plaintiff's Brief at 20-22).

The defendant argues that the Commissioner's determination is supported by

substantial evidence in the record, and must be affirmed. (Dkt. No. 10).

## FACTS

**A.  Non-Medical Evidence and Testimony**

Plaintiff was born in August 1996, and was seven years old at the time of the

---

[2] The court notes that on Page 197 of the Administrative Transcript, there is reference to an "Examination of Claimant by Medical Expert." (T. 197).  This appears to be an error, since Page 215 contains a statement by the ALJ "I don't have any other questions." (T. 215).  The questioning of the plaintiff appears to have been done only by the ALJ.  There is no indication that plaintiff was being questioned by a "medical expert."

ALJ's hearing. (T. 46, 173, 197).  Prior to entering kindergarten, plaintiff was in a "Head Start" program, and received educational assistance because of problems with language and speech. (T. 173, 131).  While plaintiff was in kindergarten, his teachers noticed global delays in both expressive and receptive language skills. (T. 131, 133, 53).  Because of those problems, plaintiff was placed in a special education class, and also received speech therapy.  (T. 59, 86).  The Committee on Special Education (CSE) at plaintiff's school recommended that plaintiff repeat kindergarten, and his mother agreed. (T. 121, 131, 133).  Plaintiff repeated kindergarten in the school year 2002-2003, and received evaluations by his teacher, Mrs. Dumas. (T. 95-96).

During the hearing, the ALJ questioned plaintiff's mother about many aspects of plaintiff's activities, health, relationship with his siblings, daily routine, school behavior, and his homework routine. (T. 179, 181-89).  Plaintiff's mother complained that plaintiff became distracted while she was attempting to have him complete his homework. (T. 189-90).  She stated that plaintiff would "be watching TV" instead of staying focused on his homework. (T. 190).  The ALJ specifically asked plaintiff's mother whether she allowed the television to be on while plaintiff is doing his homework. (T. 190).  His mother responded that, "well, I do, because his brother and sister are watching and I've had to take him away from the TV . . . ."  (T. 190).

In a "Report of Pupil Progress" for the 2002-03 school year,[3] Mrs. Dumas commented on many aspects of plaintiff's educational and personal development,

---

[3] This was plaintiff's second year in kindergarten.

including (1) Social and Emotional Development (seven categories), (2) Work Habits (six categories), (3) Readiness for Learning (eighteen categories), and (4) Physical Development (three categories).  (T. 95-96).  These comments were made at various times during the year. *Id.*  The report contains a grid, divided into sections containing spaces to rate the child's development, work habits, and readiness for learning. *Id.* The report also contains a separate section for narrative comments.  The rating is done in ten week periods starting at "10 weeks" and ending with "40 weeks." *Id.*  In her comments under the narrative section at "40 Week", Mrs. Dumas stated "family discussions at meals without the TV on is one activity that would help [plaintiff] this summer."  (T. 95).

Mrs. Dumas rated each one of the sections within the broad categories in the grid, according to a legend, with "S" indicating "Satisfactory Performance," "I" meaning "Improving, Growth Shown," and "N" indicating "Needs Improvement." (T. 95).  This was also done at the end of 10, 20, 30, and 40 weeks. (T. 95).  Under Social and Emotional Development, plaintiff had only two categories indicating that improvement was needed ("N"). (T. 95).  The remaining five categories were satisfactory at each of the ten week intervals. *Id.*

Under "Work Habits," plaintiff had two categories which showed improvement and growth, and the remaining four categories were satisfactory. *Id.* Under "Readiness for Learning," of the eighteen sub-sections, two showed that plaintiff was improving; nine showed that plaintiff's Readiness for Learning was satisfactory, and seven sub-sections showed that plaintiff's "Readiness for Learning"

4

was "very good."  (T. 96).  In the last major category of "Physical Development,"
two sub-sections were satisfactory, and one section stated that plaintiff needed
improvement.  (T. 96).

Plaintiff cites three negative comments by Mrs. Dumas at the end of three
different time periods (20th Week, 30th Week, and 40th Week) of the 2002-03 year. (T.
95).  At the end of twenty weeks, Mrs. Dumas stated that the plaintiff did not like
trying school work he believed is difficult. (T. 95).  At the end of thirty weeks, she
stated that plaintiff did not "attend" well. *Id.*  Finally, at the end of forty weeks, Mrs.
Dumas stated that plaintiff had a short attention span. (T. 95).  However, Mrs. Dumas
also made some positive comments during those time periods, and based on the
ratings in the four major categories and thirty-four sub-sections, Mrs. Dumas
recommended that plaintiff be promoted to first grade. (T. 96).

On March 3, 2003, Mrs. Dumas completed a "Teacher Questionnaire" form for
the New York State Division of Disability Determinations. (T. 78-85). This form was
completed in approximately the 25th week of school, well before the end of the
school year. (T. 85).  The form requests information about the major domains of (I)
Acquiring and Using Information (ten sub-sections) (T. 79), (II) Attending and
Completing Tasks (thirteen sub-sections) (T. 80), (III) Interacting and Relating with
Others (thirteen sub-sections) (T. 81), (IV) Moving About and Manipulating Objects
(seven sub-sections) (T. 82), (V) Caring for Himself (ten sub-sections) (T. 83), (VI)
Medical Conditions and Health (T. 84).

In the first domain of Acquiring and Using Information, Mrs. Dumas noted six

areas where there were "serious problems" on a scale where "1" refers to no problem and "5" is a "very serious" problem. (T. 79).  For the domain of Attending and Completing Tasks, Mrs. Dumas rated four categories as "an obvious problem,"[4] and four categories as "serious problems."  (T. 80). The remainder of the categories were either rated as "slight problems" or "no problems." *Id.*  Mrs. Dumas noted that it was plaintiff's second year in kindergarten, and that plaintiff needed "academic support." (T. 81).

The record contains a "Report of Pupil Progress" for the school year 2003-2004, prepared by plaintiff's first grade teacher. (T. 97-98).  This report contains ratings after the 10th, 20th, and 30th week of the school year in the major categories of Social and Emotional Development; Work Habits; Reading/Language Arts; Listening/Speaking; Handwriting; and Mathematics. (T. 97-98).  Of the 47 sub-sections in these major categories, only two are marked with the letter "N," indicating that plaintiff needed improvement in showing self control and in working quietly. (T. 97).  Three sub-sections show that plaintiff was improving with "growth shown," and the rest of the categories show that plaintiff's progress was "satisfactory," although the form clearly indicates that plaintiff was on a "modified" curriculum.

Plaintiff's first grade teachers'[5] comments state the following:

*10th Week:*  [Plaintiff] is functioning appropriately in my class.  He is

---

[4] An "obvious problem" was rated as "3," and is less than a "serious problem," rated as a "4." (T. 80).

[5] This form has comments from two teachers: "J. Hunter" and " Mrs. Passalugo. (T. 98).

learning strategies that will help him improve his reading, writing, and math skills. *J. Hunter*

**20th Week:** [Plaintiff] is making gains in the [sic] my room.  He has a very positive attitude toward his academics and seems excited about the progress that he has made.  [Plaintiff] benefits from a structured environment. *J. Hunter*

[Plaintiff] is doing well in the classroom, he needs to work on being more responsible, and bringing work back to school.  I enjoy having him in class. *Mrs. Passalugo*

**30th Week:** [Plaintiff] continues to show improvement.  He always has a smile on his face.  Please continue to read with [plaintiff] at home. *Mrs. Passalugo*

(T. 98).  Plaintiff continued to receive special education assistance as he did throughout his two years of kindergarten.

The record contains reports, dated in 2003 and 2004 from the Committee on Special Education which prepared Individualized Education Programs (IEP) for plaintiff. (T. 99-108, 109-19).  The 2004 report states that it "includes 2nd grade." (T. 109).  Each IEP contains an analysis of plaintiff's academic abilities and a detailed listing of goals and objectives.  The IEPs also refer to plaintiff's IQ scores on the "WISC III" ("Wechsler Intelligent Scale for Children").  Plaintiff's IQ scores were 71 for full scale/mental processing composite, 69 for verbal/sequential processing, and 79 for performance/simultaneous processing.  (T. 101, 111, 131).  Although the IEPs were from 2003 and 2004, the reported IQ scores were as of September 20, 2002. (T. 101, 111).  Plaintiff's IEP classified him as having a "Speech or Language impairment." (T. 99).  The plans gave plaintiff either special classes during the school day or specialized training for speech and language several times a week. (T. 100-101, 106-107, 109-19).

## B. Medical Evidence

### 1. Joanne Finn, School Psychologist

On September 20, 2002, school psychologist, Joanne Finn, prepared a psychological evaluation of the plaintiff. (T. 131-33). In her report, she states that she engaged in "record review," conducted a "teacher interview," and administered the Wechsler Intelligence Scale for Children ("WISC, Third Edition") and the Wechsler Individual Achievement Test, 2nd Edition ("WIAT - II"). (T. 131). This evaluation was performed before plaintiff was placed in kindergarten for the second time. (T. 131).

In her observations, the psychologist stated that "[plaintiff] often had difficulty understanding directions when they were given and in formulating verbal responses on the language-based sub-tests. ***These results must therefore be considered as minimal estimates of [plaintiff's] cognitive potential***." (T. 131) (emphasis added). On the IQ tests, plaintiff's verbal IQ score was 69, his performance IQ score was 79 , and his full scale IQ score was 71. (T. 131-32). The psychologist stated that plaintiff was in the "borderline range of cognitive ability," and that the results she obtained were "***lower than*** the results of testing completed in October 2000 when plaintiff earned 82 on a Stanford-Binet Fourth Edition MPC (Mental Processing Composite); a score of 79 on one additional test and 89 on a third test.[6] (T. 132).

---

[6] General Intellectual Functioning is defined by the intelligence quotient ("IQ" or "IQ equivalent") that is obtained by assessment with one or more of the standardized, individually administered intelligence tests. AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th Ed. Text Revision 2000)(DSM-IV-TR). Examples of standardized tests include the Wechsler Intelligence Scales for Children, 3rd Ed., the Stanford-Binet 4th Ed., and the Kaufman Assessment Battery for Children. *Id.*

The results of the evaluation by psychologist Joanne Finn showed that plaintiff's sub-test scores ranged from "well below average to mid-average" on the verbal tests.  (T. 132).  Plaintiff's grades on the performance tests were higher, but still on the low end of average.  (T. 132).

With respect to the Wechsler Individual Achievement Tests in reading, math, language and written expression, plaintiff was functioning "well below average when compared to his same aged peers." (T. 132).  The psychologist concluded that plaintiff has "borderline cognitive ability with weaknesses in the areas of short-term auditory memory, math reasoning, and sequencing skills." (T. 133).  The psychologist recommended continuation of speech and language therapy, plus resource room support.  She also recommended that plaintiff get visual cues and hands-on examples to facilitate his learning. (T. 133).

### 2.  Dr. Ahmad - Cortland Family Health Network

During March 2003, plaintiff's treating physician, Dr. Ahmad of the Cortland Family Health Network completed a form for the New York State Division of Disability Determinations. (T. 54, 136-39).  Dr. Ahmad stated that he had been treating plaintiff monthly since September 2002, and that plaintiff had a problem with bed wetting which had a "good response to treatments." (T. 136-37).  Dr. Ahmad commented on plaintiff's fine/gross motor skills; sensory abilities, communication skills, cognitive skills, and social/emotional skills, stating that plaintiff's function and behavior in these categories was "age appropriate." (T. 138). There are approximately nine pages of notes from visits to the Family Health

Network in the record.  (T. 140-50).

### 3.  Karen Prowda, M.D. - Board Certified Child Psychiatrist - Consultative Physician

On April 25, 2003, Dr. Karen Prowda, a Board Certified Child Psychiatrist, evaluated the records in this case for the Commissioner. (T. 152-58).  Dr. Prowda rendered an opinion regarding plaintiff's impairments. (T. 152-58).  Dr. Prowda's form-report certifies that she considered the factors in the regulations by reviewing whether the plaintiff had a severe impairment that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1, and if not, whether the plaintiff's impairments functionally equal any Listed Impairment. (T. 153).

Dr. Prowda's report states that she considered the plaintiff's functioning compared to children of the same age without impairments; considered the combined effects of multiple impairments on the plaintiff's activities; considered how well the plaintiff performs activities with respect to initiating, sustaining, and completing activities independently; and considered whether plaintiff requires extra help, adaptations, or structured or supportive settings. (T. 153).  The report also states that she considered the plaintiff's functioning in unusual settings; early intervention in school programs; the impact of any chronic illness; and the effects of any treatment. (T. 153).

After reviewing the record in this case, Dr. Prowda found that plaintiff's impairments did not meet or medically equal a Listed Impairment, and that plaintiff had a "marked" limitation in the domain of Acquiring and Using Information, and a "less than marked" limitation in Attending and Completing Tasks. (T. 154).  She

found "no limitations" in the four other domains. (T. 154-55).  Dr. Prowda found that

although plaintiff did have "severe" impairments, they neither met, medically

equaled, or functionally equaled a Listed Impairment. (T. 152).

## DISCUSSION

**1.**    **Standard for Children's SSI Benefits**

Congress amended the definition of childhood disability in 1996.  *See*

PRWORA,[7] Pub. L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42

U.S.C. § 1382c).  Prior to 1996, a child was entitled to SSI disability benefits if he or

she suffered from a "medically determinable physical or mental impairment of

comparable severity" to that which would disable an adult.  *See* 42 U.S.C. § 1382c

(a)(3)(A) (1994).

The PRWORA replaced this "comparable severity" standard with one that

focuses on whether a child has "marked and severe" limitations.  42 U.S.C. § 1382c.

This standard involves a three-step analysis.  20 C.F.R. § 416.924(a).  The first

question is whether the child is engaged in substantial gainful activity.  20 C.F.R. §

416.924(b).  If not, then the second inquiry is whether the child has a severe

impairment.  *Id.* at § 416.924(c).  A "severe" impairment is one that is more than a

"slight abnormality."  *Id.*  If the child's impairment is severe, then the third question

is whether the impairment meets or is medically or functionally equal in severity to a

disability listed in the Listing of Impairments.  *See* 20 C.F.R. §§ 416.924(d), 416.925

---

[7] Personal Responsibility and Work Opportunity Reconciliation Act of 1996
("PRWORA"), Pub. L. No. 104-193, § 211(d)(1)(A)(ii), 110 Stat. 2105 (codified at 42 U.S.C. §
1382c).

(citing 20 C.F.R. Part 404, Subpt. P, App. 1 ("the Listings")).  If all three of the above requirements are met, and the child's disability has met the twelve month durational requirement,[8] then the child will be considered disabled for purposes of SSI disability benefits. 20 C.F.R. § 416.924(d).

An impairment "meets" the severity of a listed impairment if the medical findings are "at least equal in severity and duration to criteria of any listed impairment." 20 C.F.R. § 416.926(a).  If the impairment is not listed or medically equivalent to a listed impairment, then "functional equivalence" must be examined.  An impairment is "functionally equivalent" if the impairment(s) are of listing-level severity. 20 C.F.R. § 416.926a(a).

An impairment meets listing-level severity if the impairment results in "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain . . . ." *Id.*  The six domains considered are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) the child's ability to care for him/herself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(g)-(l).

The regulations state that a child has a "marked" limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i).  A "marked" limitation is also described by the regulations as more than moderate but less than extreme and is the equivalent of the functioning expected on standardized testing

---

[8] 20 C.F.R. §§ 416.909, 416.924(d)(1).

with scores that are at least two, but less than three, standard deviations below the mean. *Id.*

A finding of an "extreme" limitation is warranted when the child's impairment(s) interferes *very* seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation is also described by the regulations as "more than marked" and the rating "given to the worst limitations." *Id.* However, although a rating of "extreme" may be given, it does not necessarily mean a total lack or loss of ability to function. 20 C.F.R. § 416.926 a(e)(3)(i). The "extreme" rating is the equivalent of the functioning expected on standardized testing with scores that are at least three standard deviations below the mean. *Id.*

## 2.   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 3.     The ALJ's Decision

The ALJ in this case found at the first step of the evaluation, that plaintiff had not engaged in any substantial gainful activity during any part of the relevant time period. (T. 12). The ALJ then found that plaintiff suffers from "a borderline level of

intellectual functioning" and has "a delay in language and speech development." (T. 12).  The ALJ found that these impairments are "severe" within the meaning of section 416.924(c). *Id.*  The ALJ considered plaintiff's impairments under two sections of the Listing of Impairments:[9] section 102.00 (Special Senses and Speech) and section 112.00 (Mental Disorders).

In making her evaluation, the ALJ found that despite plaintiff's delays in receptive and expressive language skills, he was able to understand well enough to carry out simple instructions and make himself understood, thus, he did not meet or equal Listing 102.00.  Plaintiff does not argue that this finding is incorrect, and this court agrees that Listing 102.00 is not applicable.[10]

Listing 112.00 refers to "Mental Disorders."  In the ALJ's decision, she found that although plaintiff has been diagnosed with a "learning disorder," there was no evidence of mental incapacity that would require dependence on others for personal needs or an inability to follow directions to such a degree that "would preclude the use of standardized measures of intellectual functioning." (T. 13).  The ALJ also found the standardized tests placed plaintiff in the "borderline" level of cognitive ability" that puts plaintiff "well above the minimum requirements in Section

---

[9] The Listing of Impairments contains two parts, one part contains medical criteria to evaluate impairments for adults (and certain children where appropriate), and the second part, containing criteria for the evaluation of impairments for children under the age of eighteen. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, Pt. A §§ 1.00-14.00 (adults) and Pt. B §§ 100.00-114.00 (children).

[10] The court notes that the criteria in Listing 102.00 focus more visual and hearing impairments in children.  The medical findings in this section and do not appear to exist in this case.

112.05A, B, C, D, E, or F." (T. 13).

The ALJ also considered plaintiff's other characteristics, daily activities, and how plaintiff compared to unimpaired children of his age. (T. 13-14). Because the ALJ found that plaintiff did not meet or "medically equal" a Listed Impairment, the ALJ also considered whether plaintiff's impairments were "functionally equal" to a Listed impairment by considering the limitations in the six domains of functioning listed. (T. 15). The ALJ determined that plaintiff had a "marked" limitation in only one domain, while he had either "less than marked" or "no limitations" in others. (T. 15-20). The ALJ considered each domain and the plaintiff's limitations within that domain, separately. *Id.* Based on the evidence considered, the ALJ found that plaintiff was not disabled for purposes of SSI. (T. 20-21).

## 4. __Listings 112.05(D) and/or 112.05(F)__

Plaintiff's counsel argues that plaintiff's impairments meet and functionally equal the Listed Impairments in section 112.05(D) and 112.05(F). Section 112.05 is entitled "Mental Retardation." This section contains six subsections, (A) through (F). In order to meet or medically equal the criteria in section 112.05(D), the regulations state that plaintiff must have a "valid verbal, performance, or full scale IQ of 60 through 70 ***and*** a physical or other mental impairment imposing an additional and significant limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05(D).

Section 112.05(F) states that the child must first satisfy the requirements of section 112.02(B)(2)(a) ***and*** have a "physical or other mental impairment imposing

16

and additional and significant limitation of function." Section 112.02(B)(2)(a) provides that the child must have a "[m]arked impairment in age appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including if necessary, the results of appropriate standardized psychological tests . . . ." *Id.*

The difference between section 112.05(D) and 112.05(F) appears to be the presence or absence of standardized testing to substantiate the deficit in intellectual or cognitive functioning. Under section 112.05(D) the plaintiff must have the IQ score below 70 in order to proceed to the second requirement of the Listing. In section 112.05(F), the IQ score is not "required" but may be considered in determining whether the plaintiff has a "marked impairment of age appropriate cognitive/communicative function." Thus, section 112.05(F) may be used when IQ scores are not available or the available scores are outdated.

The second factor in both the Listings is **identical**, and requires an additional "severe" mental or physical impairment. *See Pimentel v. Barnhart*, 04-CV-3769, 2006 U.S. Dist. LEXIS 49271, *30-33 & *32 n.8 (S.D.N.Y. July 19, 2006)(discussing the requirements of section 112.05(F)). The court in *Pimentel* also found that a "marked" limitation in the domain of acquiring and using information is equivalent to a finding of "marked" impairment in age appropriate and communicative function. *Id.* at *35 (citing *Cruz v. Barnhart*, 04 Civ. 9794, 2005 U.S.

17

Dist. LEXIS 17472, *33-34 (S.D.N.Y. Aug. 23, 2005)).

In this case, based upon school psychologist, Joanne Finn's September 20, 2002 report, plaintiff's counsel argues that plaintiff's verbal IQ score of 69, places plaintiff squarely within the first part of section 112.05(D). The second part of section 112.05(D) requires that in addition to the IQ score, plaintiff have another impairment or impairments, either physical or mental that impose "additional and significant limitation of function. Plaintiff's counsel argues that this additional impairment is satisfied by plaintiff's documented "speech and language delay." Plaintiff's Brief at 14-15.

Defendant argues that the "speech and language delay" does **not** constitute a separate impairment for purposes of section 112.05(D). Defendant's Brief at 6. Defendant cites Social Security Ruling (SSR) 98-1p as support for this argument. SSR 98-1p was issued to assist in the evaluation of "a combination of cognitive and speech disorders." SSR 98-1p (1998). SSR 98-1p specifies that in order to satisfy the additional mental or physical impairment requirement, the speech problems "must be separate from his/her mild mental retardation." SSR 98-1p(III)(A). The theory behind this requirement is that a child with mental retardation will often have a delay in speech development that is "commensurate with the level of cognitive functioning." *Id.* Thus, if the delay is consistent with the child's general intellectual functioning, the delay is not regarded as separate from the mental retardation and may not be used to fulfill the second part of sections 112.05(D) or 112.05(F). *Id.*

However, the court does note that SSR 98-1p refers only to "speech" delays,

and distinguishes "speech" from "language (receptive and expressive)." SSR 98-1p(II)(B). Speech is defined as the production of sounds for purpose of oral communication, while language provides the "message of communication, and involves the use of semantics, . . . syntax, . . . and pragmatics (i.e. the use of language in its social context) in the understanding and expression of messages." *Id.* SSR 98-1p specifically provides that it does not address evaluation of "receptive or expressive language disorders, which can also result in disability." SSR 98-1p n.1. In this case, the defendant's argument regarding SSR 98-1p may not be completely determinative since plaintiff has both speech ***and language*** delay.

Plaintiff's counsel argues that plaintiff's verbal IQ score of 69[11] meets the first part of section 112.05(D) and his marked deficit in acquiring and using information meets the first part of section 112.05(F). However, according to the regulations, the IQ scores may not have been completely valid. The regulations provide that IQ scores should be "sufficiently current." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.00 (D)(10). This section provides that an IQ score obtained before the age of 7 is "current" for one year if the score is 40 or above. The tests taken in plaintiff's case were in September of 2002, and plaintiff was 6 years old. Thus, according to the

---

[11] The court does note that the ALJ states in her decision that the "standardized tests" placed plaintiff in the "borderline level of cognitive ability, well above the minimum requirements" in the Listings. (T. 13). It is unclear to what the ALJ is referring. The 2002 IQ test did contain the verbal score of 69 that is within the requirement of section 112.05(D). However, the ALJ may have been referring to the statement that a "borderline level of cognitive ability" would place plaintiff above the minimum requirements for the Listings. Since the ALJ did not mention the IQ scores themselves, it is unclear whether she made an error or not. Assuming that the ALJ did err in making this statement, the error would not affect this court's decision, based on this court's analysis regarding the IQ scores and the substantial evidence supporting the ALJ's ultimate conclusion.

regulations, the test would only have been technically "current" until 2003.  The ALJ hearing was in 2004.

Additionally, when Joanne Finn tested plaintiff in September 2002 and found scores of 69 for verbal IQ, 79 for performance IQ, and 71 for full-scale IQ, she specifically referred to testing during October 2000 when plaintiff was given the Stanford-Binet IQ tests, and received higher ratings of 82 for the mental processing composite and 79 and 89 for other areas. (T. 132).  She referred to the higher October 2000 IQ scores, and *specifically* stated that the results of the Wechsler Intelligence IQ tests must be considered as "*minimal* estimates of [plaintiff's] cognitive potential."  (T. 131)(emphasis added).  She also stated that his receptive and expressive language deficits impacted on his testing. (T. 131).  Thus, although plaintiff's 2002 verbal IQ test score was sufficiently low to meet the Listing, it is clear that the score was not "current" and was not necessarily valid.

Although the ALJ did not mention the "validity" of the IQ tests, the ALJ specifically stated that she noted "how far the claimant has progressed since his initial speech and language assessment revealing "severe" delays."  (T. 18).  Plaintiff's counsel recognizes that the IQ tests may not be "current," but states that they can be considered when the plaintiff's functioning has been "consistent over time." Plaintiff's Brief at 14.  However, plaintiff's functioning has clearly not been "consistent" over time.  As the ALJ noted in her decision, plaintiff steadily improved in his abilities over time. (T. 17-18).  Thus, section 112.05(D) is not applicable to plaintiff's case due to the possible invalidity or inaccuracy of the IQ measurement

and plaintiff's substantial improvement over time.

Without relying specifically upon the IQ score as allowing plaintiff to meet a Listed Impairment, the appropriate listing would be section 112.05(F).  As stated above, plaintiff does have a marked deficit in cognitive/communicative function which is the equivalent of the ALJ's finding that plaintiff had a "marked" limitation in acquiring and using information.  However, the fact that the first section of 112.05(F) includes the "communication" deficit, which would ***include*** plaintiff's speech and language delays, plaintiff does not have an ***additional*** physical or mental impairment that would significantly affect his ability to function.  Thus, plaintiff does not meet the second requirement of section 112.05(F).  The ALJ's findings that plaintiff does not meet or medically equal a Listed Impairment is supported by substantial evidence.

## 5.   **Functional Equivalence**

_____Plaintiff also argues that his impairments are functionally equal to a Listed Impairment.  He states that he has limitations which are "marked" in more than one domain.  The ALJ found that plaintiff only had one "marked" deficit in the area of acquiring and using information. (T. 18).  The ALJ did preface that finding by stating that plaintiff had improved substantially over time, and implied that she was only finding a "marked" limitation considering the "relevant" period and making a "finding in the light most favorable to the claimant." (T. 17-18).

Plaintiff argues that the second domain in which plaintiff has "marked" deficits is in attending and completing tasks. Plaintiff's Brief at 20.  The ALJ found

that plaintiff had a "less than marked" impairment in this domain. (T. 18).  Plaintiff quotes the statements by his teachers and the statements in his IEP showing that he was having difficulty with school subjects. Plaintiff's Brief at 20-22.  While it is true that plaintiff's teachers and others commented about specific situations, plaintiff clearly progressed in his school abilities as demonstrated by his teachers' ratings at the end of his second year of kindergarten. (T. 95-96).

In addition, the evaluation by his first grade teacher toward the end of the first grade clearly shows that plaintiff was improving in eight of the thirty-nine categories rated, and had satisfactory ratings in twenty-nine of those categories.  Only two categories showed that plaintiff needed improvement.  The first grade teacher commented that plaintiff was "functioning appropriately in my class," and was making gains.  (T. 98).  In addition, his first grade teacher said that plaintiff "continues to show improvement."  (T. 98).  The ALJ reviewed the evidence in her decision, finding that although there was evidence showing that plaintiff had problems in this area, there were also reports indicating that plaintiff's attention span was "improving." (T. 18).  Mrs. Dumas rated plaintiff's ability to complete tasks in a timely manner as "satisfactory" throughout the 2002-03 school year in addition to stating in the 30th and 40th weeks that plaintiff's attention span was "improving." (T. 95).

While there is conflicting evidence during the early evaluations in kindergarten, plaintiff's ratings at the end of kindergarten and toward the end of his first year are clearly much improved, and there is substantial evidence in the record

for the ALJ's conclusions regarding plaintiff's improvement.  (T. 17, 18). It is the responsibility of the ALJ, not the court, to weigh conflicting evidence. *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998).

Significantly, the medical evidence in the record, namely the evaluation by a Board Certified Child Psychiatrist and by plaintiff's ***own treating physician*** support the ALJ's conclusion that plaintiff does ***not*** have limitations that are "marked" in any more than one of the domains that are analyzed under the regulations.

Plaintiff's Brief quotes testimony from his mother.  The ALJ specifically found that plaintiff's mother had made contrasting statements about plaintiff's ability to focus and follow directions.  (T. 18).  The record also contains a statement by plaintiff's kindergarten teacher in her summary of the school year 2002-2003 where Mrs. Dumas specifically commented that although plaintiff's mother wants to help the plaintiff, she "[h]as problems following thru w/ school's suggestions."  (T. 124). Although no specific finding was made about the credibility of plaintiff's mother, the ALJ's comments about the mother's inconsistent testimony is supported by substantial evidence in the record.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **AFFIRMED** and the Complaint (Dkt. No. 1) be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d

15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: July 3, 2008

Hon. Gustave J. DiBianco
U.S. Magistrate Judge